*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. K. TAYLOR, Minor.

UNPUBLISHED
February 22, 2024

No. 366620
Van Buren Circuit Court
Family Division
LC No. 23-019744-NA

Before: HOOD, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court's initial order of disposition related to the minor child, AKT.[1] On appeal, however, respondent-father challenges the trial court's exercise of jurisdiction over AKT under MCL 712A.2(b)(1) and MCL 712A.2(b)(2). We affirm.

## I. BACKGROUND

This case concerns the trial court's exercise of jurisdiction over AKT related to her father's[2] parental rights. WT is AKT's mother and gave birth to her in February 2020. She and AKT (and another of WT's children) are "little people," i.e., they have the medical condition known as "dwarfism," a fact that is relevant only to the extent it bears on AKT's medical care, the unique bond between AKT and her parents, and the physical interaction between respondent-father and WT.

## A. AKT'S BIRTH AND MEDICAL ISSUES

---

[1] AKT has a brother and sister, neither of whom are at issue in this appeal but were also included in the petition in this case. Each child has a different father, and respondent-father is the only one relevant to this appeal. AKT's mother, WT, is also not at issue in this appeal.

[2] According to Debra Kelly, a Children's Protective Services caseworker, respondent-father was "defaulted as the legal father" in a Friend of the Court case in Van Buren County. Respondent-father confirmed that he was legally made AKT's father by default. He also testified that he knew "for a fact" that AKT was his biological child because he took a DNA test when he "had her with [him] in Indianapolis."

As a baby, AKT had sleep apnea, breathing problems, and eating issues, and was hospitalized for four months after she was born. During her hospitalization, respondent-father visited, though "it wasn't an everyday thing," according to WT. Respondent-father, however, testified that WT did not include him on a list of permissible visitors as part of COVID-19 restrictions, which limited his visits. To address her eating issues, AKT had a feeding tube while hospitalized to ensure she received proper nutrition. At some point while she had the feeding tube, AKT pulled it out and had it out for "quite some time." WT testified that AKT had dysphasia and swallowing issues as a baby, but those conditions went away by the time she turned a year old. AKT still had breathing issues and sleep apnea, and still had several medical appointments because of her conditions.

Respondent-father did not attend the majority of AKT's medical appointments. The evidence showed that in the three years of AKT's life as of the adjudication trial, he had attended two appointments—a surgery in Kalamazoo and a sleep study in Ann Arbor. WT was the only one who attended AKT's medical appointments and she did not contact respondent-father about them. She stated that she did not do so, however, because he often changed his phone number, so she instead waited for him to contact her. And although WT knew his mother TM's phone number, WT thought she "shouldn't have to go through the mother to get to the son." TM confirmed that respondent-father attended appointments when he was aware of them, including the sleep study and surgery. Those two appointments were the only two she "really knew about," but she noted that "[t]hey get changed so much."

According to respondent-father, WT "[s]ometimes" told him about AKT's appointments. He also denied that he changed his phone number, testifying that although he sometimes changed physical phones, his number remained the same throughout the case. He also asked WT to use an app on her phone that would give him access to AKT's medical information, but WT rejected the idea because her account had her medical information, as well as AKT's and her son WH's information. Respondent-father also offered to take AKT to a hospital in Indianapolis, but his offers were "really just . . . suggestion[s] because [he has] no authority in this situation."

B. DOMESTIC VIOLENCE INCIDENT

On January 20, 2023, AKT had a sleep study appointment in Ann Arbor. Kathryn Block, an employee of Van Buren County Community Mental Health with the "New Outlook/Wraparound Program," drove respondent-father, WT, and AKT to and from the appointment.[3] According to Block, respondent-father sat in the backseat and read, sang, and talked to AKT. During the drive, respondent-father and WT had "disagreements." The disagreements were "simple": he did not agree with the food WT fed AKT, nor the music that she played for her. He testified he disagreed with WT frequently feeding AKT fast food and exposing AKT to music that was inappropriate for her age, and he preferred to expose AKT to children's songs and age-appropriate TV. During the drive, respondent-father and WT cussed, yelled, and screamed, and there was a "a lot of emotion going on" to the point Block had to stop at a rest area once or twice to calm them down. Block "wouldn't say" that respondent-father was acting

---

[3] Block started working with AKT in October or November 2021 because of medical neglect. According to Block, WT was often unable to transport her children to appointments in Ann Arbor, so Block assisted with transporting AKT (and her brother) to medical appointments in Ann Arbor and Kalamazoo. Another worker, identified by Block as Marilyn Jenkins, transported WT and her children to local appointments.

threateningly, but stated that the "drive there and the drive back was very uncomfortable between everybody."[4]  Block eventually dropped off respondent-father, WT, and AKT at WT's home in Covert, Michigan, after the appointment.  Arguments and an alleged physical altercation ensued.

Once at WT's home, respondent-father and WT agreed that respondent-father would take AKT so WT could clean.  Respondent-father's ex-wife, EA,[5] arrived to pick him up from WT's home, parked in WT's driveway, and stayed in her vehicle.  Respondent-father began gathering AKT's belongings, at which point AKT became upset, according to WT, "as if she doesn't want to go."  According to respondent-father, however, WT "took [AKT] aside" and asked "[AKT], do you want to leave mommy, do you want to leave mommy[?]"  Respondent-father indicated that AKT responded "no" and WT "said [AKT] not leaving . . . ."  This led to an argument between respondent-father and WT about whether AKT would go with him.  This verbal argument, which included yelling and cussing, took place in front of AKT.[6]

The argument escalated and moved outside (AKT remained inside the home).  WT and respondent-father provided differing accounts of what happened next.  According to WT, once outside, respondent-father hit WT in the head with one of two baskets or totes he was carrying before kicking her.  Respondent-father knew that WT was pregnant at the time of the incident.

Respondent-father, on the other hand, testified that he walked out of the home and jogged to EA's car, with WT chasing after him:

> I kind of jogged to the car because I was trying to get away from there but as I'm jogging to the car, [WT] is literally running behind.  You know what I'm saying, she's running behind me, she's cussing at me.  I try to take my things around the car because the car parked right here, there's a tree right here, the way her driveway is.  I'm taking it around this way, [WT] try to cut me off between the car, she has a bowl in her hand, she's trying to hit me with the bowl and that's when [EA] was like you all got to quit this, you all got to stop.

Respondent-father denied threatening WT during the January 20, 2023 incident, explaining that he "gain[ed] nothing from threatening [WT]."  He noted that he is "six foot, two and she's, she's [WT].  I

---

[4] Respondent-father acknowledged sounding "aggressive" at times when expressing his view, but he explained that AKT was his only child and "she only gets one time to grow, one time to be tainted, one time to be sent up on the wrong path."  He further stated: "You can't correct bad behavior but [it is] easy to instill good morals and good behavior but you can't correct that stuff, it's hard."  Respondent-father explained that WT felt like he judged her, but he denied that was his intention; he was trying to "nudge her" in the right direction for AKT.

[5] EA and respondent-father divorced in November 2021, but, according to EA, he remained her best friend.

[6] WT admitted cussing at respondent-father but denied being aggressive toward him.  She acknowledged possibly cussing in front of AKT, though she did not believe that AKT was with them when they were arguing.  Respondent-father, on the other hand, testified that he "kept [his] composure" for AKT's sake, stating that AKT did not "have to see [him] behave in a certain manner," even if WT behaved "in a certain manner . . . ."

don't get nothing from harming her. She's the mother of my child, there's nothing that I can earn." EA, who was waiting outside, corroborated respondent-father's testimony and denied that respondent-father acted in an aggressive or threatening way toward WT, instead indicating that WT acted aggressively.

The incident led WT to call the police and seek medical treatment to confirm that her unborn baby was okay. WT did not want AKT around respondent-father because he had an "anger problem" and had assaulted WT in the past. Respondent-father later called WT and cussed her out for calling the police. During the conversation, respondent-father stated, "[Y]ou can call your mother in heaven too." WT felt threatened by this phone call. Respondent-father was upset because WT "press[ed] a charge of Domestic Violence" against him and he wanted her to drop it.

## C. RESPONDENT-FATHER'S SUPPORT AND BOND WITH AKT

In 2019, respondent-father moved to Indianapolis. There, he rented his residence and had two jobs, one dispatching trucks and another working security at a bank. At trial, respondent-father indicated he planned to relocate to Michigan. And although he did not have his own personal transportation as of the May 2023 adjudication hearing (having just "wrecked [his] car"), he could use his step-father's, mother's, or ex-wife's vehicle. He indicated he was "more than able to get the resources [he] need[ed] if [he] don't have them."

Respondent-father stated that he "[a]bsolutely" had a relationship with AKT and had a "great bond" with her. He acknowledged spending time with AKT over the past three years, though it was "not as much as [he] would like." His time with AKT depended on the status of his relationship with WT: if they were not on good terms, AKT could not "come around [respondent-father]." Respondent-father denied seeing AKT every month, indicating instead that he saw her varying periods (10 days one time, 3 times the next). He testified that AKT liked to "cuddle," "sing," "run around, play hide and seek, she likes all things that children love to do." And he affirmed that AKT was excited when he picked her up and "when she's with [him]," though she felt "conflicted when she ha[d] to leave [WT]." WT acknowledged the bond between respondent-father and AKT, but also testified that AKT "acts like she's scared of him." WT affirmed that respondent-father visited AKT throughout her life when she (WT) allowed it and that he had asked for more time with AKT.

When together, respondent-father spent time with AKT at parks and various outings. These trips included AKT, respondent-father, EA (respondent-father's ex-wife), and EA's children. AKT "has a bond with those children," EA, and with respondent-father's "father, step-father, [and] mother." He wanted AKT to be around "a nice circle of people" to "understand that she's accepted in the community . . . ." But he did not want AKT separated from WT because WT "is a little person who's going to teach [AKT] how to be a little person growing up." He acknowledged he "can't teach her that," so "the idea that [WT] shouldn't be in her life, that's not my idea of growth for [AKT]."

Respondent-father also kept AKT "fed well," indicating she liked fruit ("berries" and bananas), vegetables, and oatmeal. He also had a high chair for AKT and bought her groceries and new clothing. He also bought groceries for WT and either had them delivered to her home or informed her they were ready for pickup at Meijer or Walmart. Respondent-father expressed concerns about AKT's bowel movements when she returned from WT's care, noting they took a "long time." But he knew that if he gave AKT fiber, it would "speed up" her bowel movements. Respondent-father also changed AKT's

diapers, bathed her and did her hair, and put her to bed. He also acknowledged attending birthdays and buying AKT gifts, indicating, however, that he did not celebrate or attend holidays because he is Muslim.

Respondent-father's mother, TM, described his relationship with AKT as "cute," explaining that he was "really good with her." According to TM, respondent-father watched cartoons with AKT, played and sang with her, took her on walks, and fed, bathed, and dressed her. TM also stated that respondent-father was involved in AKT's life "[a]s much as he's allowed to," affirming that WT would sometimes "not allow[] it[.]" She indicated respondent-father had not visited with AKT since January 20, 2023, and that he had limited contact with AKT since around December 2022.

Respondent-father normally sent WT money through CashApp, and did so whenever she asked for it. If ever "strapped for cash," respondent-father's mother covered the payment and he reimbursed her, which TM confirmed. According to respondent-father, he had been sending WT money over CashApp since 2020 and had done so as of the May 23, 2023 adjudication hearing. TM, however, did not believe that these payments and purchases were occurring as of the May 2023 hearing because respondent-father "was out of work for a while" and he and WT "fell out." WT indicated that when she asked respondent-father for help obtaining items like diapers, he provided them or called his mother, who would help WT. According to WT, however, she last received money specifically from respondent-father (not TM) in early January 2023, before the January 20, 2023 incident.

## D. INABILITY TO CONTACT RESPONDENT-FATHER

Both Block and Children's Protective Services (CPS) caseworker Debra Kelly testified that they had minimal contact with respondent-father. Block, who had started working with AKT around October or November 2021, met respondent-father for the first time during the January 20, 2023 car ride. Block's contact with respondent-father was limited to him trying to contact her "a time or two," speaking with him in January or February 2023 (after the January 20, 2023 appointment), and a recent attempt at contact by respondent-father a couple weeks before the adjudication trial.

Kelly, who also got involved in the case in approximately November 2021, "called several numbers" for respondent-father, provided to her by "New Outlook," WT, and respondent-father's mother, but she had personally "never reached him." She did, however, testify about an incident on December 1, 2022, involving a phone call in which WT and Kelly sought the return of AKT from respondent-father. At a family team meeting, WT informed Kelly that respondent-father "took [AKT] a few days prior and that she was supposed to return home," but respondent-father would not provide the child's location. Kelly "didn't have a phone number" for respondent-father, so WT called him. According to Kelly, respondent-father was "aggressive" with WT on the phone, stating that he did not have transportation to return AKT but indicating he would call his girlfriend. Kelly and WT called respondent-father's girlfriend, who "provided the address of where [AKT] was at that time," so either WT or Kelly could pick her up. Kelly testified that respondent-father called back, refused to give his contact information, and said he would return AKT that day. Kelly confirmed that respondent-father returned AKT home. Kelly had not heard from respondent-father since the December 1, 2022 incident, though she stated that she attempted to notify respondent-father of court dates and meetings and he did not respond.

Respondent-father stated he was "caught off guard" by the situation on December 1, 2022, indicating that he was supposed to have AKT for a longer period than allowed:

The situation that the young lady was talking about, I was supposed to have [AKT] for a lot longer than what happened and then when I got a call it was like the CPS lady want to talk to you and I'm like I don't want to talk to her, you get what I'm saying. So, it wasn't that I was at odds with the CPS lady, it was more of this whole situation kind of caught me off guard and who was CPS to tell me where I have to take my child. That was something I wanted to avoid.

He denied being "a little type A or intense" when having to end his time with AKT. He felt he had "no say so" in the relationship, and had a "CPS lady" telling him to "bring [his] child back" simply because "[she] said so." When this happened, it was "kind of hard for [him] to accept."

## E. PROCEDURAL HISTORY

In early March 2023, the Van Buren County Department of Health and Human Services (DHHS) petitioned for the trial court to exercise jurisdiction over AKT and her two siblings who were living with WT at the time. DHHS alleged that WT used Percocet without a prescription, had an opiate addiction, and the youngest child was born with withdrawal symptoms. It also alleged that WT failed to attend several medically-necessarily appointments for AKT and another of WT's children. Relevant here, DHHS's early March 2023 petition listed respondent-father as AKT's legal father, but did not yet list him as a respondent.

Three weeks later, in late March 2023, DHHS filed a first amended petition. Relevant here, DHHS added respondent-father as a respondent and alleged that he and WT were "in a domestic violence altercation . . . with the child [AKT] present." It also alleged that respondent-father had not provided medical or financial care for AKT "for a period of time," and that he had not "provided for [her] medical needs . . . ." DHHS further alleged that respondent-father did "not have an established relationship with [AKT]." It therefore asked the trial court to authorize the petition, exercise jurisdiction over AKT and her two siblings under MCL 712A.2(b)(1) and (2), and issue an order removing them from WT's home. The trial court in late March 2023 entered an order after a preliminary hearing authorizing the petition and placing AKT and WT's son, WH, with a relative.

In late May 2023, the trial court held an adjudication trial related to, relevant here, AKT and respondent-father. Those testifying included WT, Block, Kelly, and respondent-father. Respondent-father's ex-wife, EA, and his mother, TM, also testified. Much of the testimony centered around AKT's medical appointments and financial support, but it also included testimony by Block, WT, respondent-father, and EA about the January 20, 2023 incident, as described earlier.

After the testimony, the trial court found that a preponderance of the evidence supported exercising jurisdiction over AKT. The court found that there was a "hostile environment in the home and in the vehicle" on January 20, 2023, and AKT was present for the altercation. The trial court also found that respondent-father had not provided financial care for AKT since at least January 2023, noting, however, that it also appeared he had not paid WT anything since June 2022. It acknowledged there "may have been some financial support" from TM, though it found that was "not substantial" and not "what it takes to raise a child . . . ." The trial court noted that it had found out for the first time at the trial that respondent-father lived in Indianapolis. And it found that he did not provide medical care for AKT, noting that he only went to two doctor appointments for AKT, and had not provided medical insurance or costs. It therefore found that a preponderance of the evidence supported exercising jurisdiction over AKT.

A dispositional hearing took place in early June 2023. At this point, respondent-father was incarcerated and his attorney asked that DHHS keep respondent-father updated on AKT's appointments and determine what services he could participate in while incarcerated. Respondent-father objected to his attorney's failure to present all the evidence respondent-father provided her. He believed that had all of the evidence been presented, there "could have been a different outcome . . . ." The trial court stated that respondent-father's objection related to "a separate appeal from the adjudication," which had been requested. This appeal followed.

## II. JURISDICTION

Respondent-father argues that the trial court erred by determining that there was sufficient evidence that he neglected AKT and thus abused its discretion when it exercised jurisdiction over her. We disagree.

### A. STANDARD OF REVIEW

To properly exercise jurisdiction, a trial court must find by a preponderance of the evidence that a statutory basis for jurisdiction exists. *In re Long*, 326 Mich App 455, 460; 927 NW2d 724 (2018). We review "the trial court's decision to exercise jurisdiction for clear error in light of the court's findings of fact." *Id*. (quotation marks and citation omitted). "A finding is clearly erroneous if, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted). We generally defer to the trial court's credibility assessments. *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

### B. LAW AND ANALYSIS

Child protective proceedings in Michigan "comprise two phases: the adjudicative phase and the dispositional phase." *In re Sanders*, 495 Mich 395, 404; 852 NW2d 524 (2014). During the adjudicative phase, the court generally evaluates whether it can take jurisdiction over the child. *Id*. Once it has jurisdiction, the court then "determines during the dispositional phase what course of action will ensure the child's safety and well-being." *Id*.

The Michigan Department of Health and Human Services initiates child protective proceedings when it files a petition in the trial court containing facts "constituting an offense against a child under MCL 712A.2(b) . . . ." *In re Long*, 326 Mich App at 459. "To acquire jurisdiction, the factfinder must determine by a preponderance of the evidence that the child comes within the statutory requirements of MCL 712A.2 . . . ." *Id*. (quotation marks and citation omitted). The statute "speaks in the present tense," so the court "must examine the child's situation at the time the petition was filed." *Id*. (quotation marks and citation omitted). Though these proceedings are initiated to protect children, "the adjudicative phase 'is of critical importance because the procedures used in the adjudicative hearings protect the parents from the risk of erroneous deprivation of their parental rights.' " *Id*., quoting *In re Sanders*, 495 Mich at 405-406.

Here, DHHS relied on MCL 712A.2(b)(1) and (b)(2) as grounds for jurisdiction. The trial court assumed jurisdiction under MCL 712A.2, which provides, in relevant part:

(b) Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:

(1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship.

* * *

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. As used in this sub-subdivision, "neglect" means that term as defined in section 2 of the child abuse and neglect prevention act, 1982 PA 250, MCL 722.602.

### 1. MCL 712A.2(b)(1)

This Court has affirmed a trial court's exercise of jurisdiction under MCL 712A.2(b)(1) when a parent, after placing a child with relatives, takes "little interest" in resuming parental duties with the child. *In re BZ*, 264 Mich App 286, 295-296; 690 NW2d 505 (2004).

The trial court did not clearly err when it found that a preponderance of the evidence supported exercising jurisdiction over AKT under MCL 712A.2(b)(1). Regarding medical care, at the time DHHS filed the petition, AKT was living with WT, not respondent-father. Respondent-father had lived in Indianapolis since 2019 and acknowledged having little knowledge about AKT's medical needs. AKT had significant medical issues, including sleep apnea and a feeding tube, that required her to attend numerous medical appointments. Though WT typically failed to inform respondent-father about AKT's appointments, respondent-father failed to communicate with WT about AKT's medical care generally. And although the evidence showed that WT missed or had to reschedule several appointments for AKT, it also showed that respondent-father had minimal participation in the medical appointments, having attended only two in the three years of AKT's life as of the filing of the petition.

DHHS caseworkers also testified that they had little interaction with respondent-father. Kelly unsuccessfully attempted to contact respondent by mail for several months. The first time she made contact (on December 1, 2022), she used WT's phone to instruct him to return AKT. Block, the other caseworker, met respondent-father for the first time on January 20, 2023, when she transported him, WT, and AKT to Ann Arbor for AKT's sleep study. Both caseworkers also testified that they unsuccessfully attempted to contact respondent-father about meetings and court dates before the initial adjudication hearing, describing their interaction with him as minimal. Respondent-father denied that any caseworkers attempted to contact him, however.

Regarding financial support, respondent-father, TM, and even WT testified that respondent-father had, in the past, contributed financial support for AKT. Respondent-father sent money over CashApp for diapers and other necessary items when WT asked. Respondent-father testified that he ordered groceries for WT to pick up from the store or that were delivered to her home. If respondent-father ever had insufficient funds, he had TM, his mother, send money to WT for AKT, and he reimbursed his mother. Although respondent-father testified that he sent WT CashApp payments from the time of AKT's birth

through the initial adjudication hearing, other evidence showed that he had not provided any financial support for the child during at least the four months after the January 20, 2023 incident until the initial adjudication hearing. Respondent-father also testified that he had recently "wrecked" his vehicle. He did, however, have family that would help him with transportation.

Although evidence showed that respondent-father contributed some financial support for AKT, other evidence showed that he was not involved with AKT's medical care and showed minimal interest in his parental responsibilities to her. Respondent-father attended only two of numerous medical appointments for AKT despite knowing that she had significant medical needs since birth. And although respondent-father contributed to AKT's care in the past, the evidence showed that he had not paid any support by himself or through his mother since the January 20, 2023 incident. Evidence also suggested he had not sent payment since approximately a year before the adjudication. Further, although respondent-father testified that he had two jobs, his mother believed he was no longer employed. He also no longer had his own transportation as of the May 2023 hearing. Additionally, TM testified that respondent-father had not visited with AKT since the January 20, 2023 incident. And despite respondent-father's testimony that he wanted a better relationship with AKT, the evidence showed that WT was the sole caretaker for AKT (before removal) and that respondent-father contributed only minimal support for a high-needs child. Respondent-father's lack of communication and attentiveness to AKT's medical care and his minimal financial contributions and supported the trial court's finding that he had failed to provide proper or necessary support for AKT under MCL 712A.2(b)(1). It therefore properly exercised jurisdiction over AKT under Subsection (b)(1).

## 2. MCL 712A.2(b)(2)

Additionally, the trial court did not err by exercising jurisdiction over AKT under MCL 712A.2(b)(2). This Court has held that violence between parents in the children's presence is relevant to show that the parents were unfit by reason of criminality or depravity. *In re Miller*, 182 Mich App 70, 80; 451 NW2d 576 (1990). Here, the focus under this subsection is on the January 20, 2023 incident between respondent-father and WT. Describing her version of events, WT testified that there was a verbal argument that occurred in AKT's presence and alleged physical abuse against WT that happened outside the home, outside AKT's presence. WT alleged that respondent-father hit her with a tote bag and kicked her when she was noticeably pregnant, causing her to fall to the ground. She testified that "the lady that was with [respondent-father]," EA, said, " '[Respondent-father, no, [respondent-father] no' " before respondent-father kicked WT. This conduct led WT to report the incident to police, which eventually resulted in respondent-father being charged with domestic violence. After WT reported the incident to police, she testified, respondent-father called her and made threatening remarks ("[Y]ou can call your mother in heaven too.").

In addition to WT's testimony, Block testified that on January 20, 2023, respondent-father and WT "cuss[ed] and yell[ed] and scream[ed]" at each other when she drove them to and from Ann Arbor for AKT's doctor appointment. Block confirmed that AKT was in the vehicle during the verbal argument. She also testified that she had to stop at a rest area multiple times to defuse the situation. Kelly also testified about a December 2022 phone call during which respondent-father was aggressive. Acknowledging respondent-father's testimony about these incidents, we are not definitely and firmly convinced that the trial court erred when it found by a preponderance of the evidence that domestic violence took place in front of AKT.

Respondent-father challenged the domestic-violence allegation at the adjudication trial by presenting a video recording of a portion of the January 20, 2023 incident and denied that he struck or kicked WT. He instead maintained that WT physically assaulted him. To support this allegation against WT, respondent-father presented the testimony of EA, who testified that WT chased respondent-father out of the home with a bowl and denied that respondent-father physically assaulted WT. Respondent-father acknowledged, however, that a verbal argument occurred in front of AKT that involved profanity and threats, noting that AKT's voice could be heard during the video recording. The parties did not present evidence that AKT witnessed the altercation that continued outside the home, though respondent-father believed she did not.

Although there was conflicting evidence regarding who was the initial aggressor of the January 20, 2023 incident, the parties do not dispute that at least a portion of the incident occurred in front of AKT, both in the vehicle to and from Ann Arbor and in WT's home. Further, the testimony of WT, Block, and Kelly demonstrated that respondent-father had aggressive tendencies and a temper. And although WT testified that respondent-father and AKT had a bond, she also testified that if AKT "were to come in right now, she wouldn't go to him" and that she "acts like she's scared of him." Though respondent-father painted it as "emotional manipulation," WT also testified that at one point during the January 20, 2023 incident, AKT expressed to WT that she did not want to leave with respondent-father. To the extent the trial court credited WT's testimony more than respondent-father's, we defer to that credibility determination. See *In re White*, 303 Mich App at 711. We therefore conclude that AKT's exposure to domestic violence supported the trial court's exercise of jurisdiction over AKT under MCL 712A.2(b)(2).

We affirm.

/s/ Noah P. Hood
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado